HENRY C. ARMSTONG, APPELLEE, v. EDWIN P. SWEENEY, SHERIFF, ET AL., APPELLANTS.

FILED MAY 3, 1905.     No. 13,645.

1. **Bankruptcy: JUDGMENT: INJUNCTION.** Where a discharged bankrupt seeks to enjoin the collection of a judgment against him which was not listed in the name of the creditor in the bankruptcy proceedings, he must plead and prove that the creditor had notice or knowledge of such proceedings in time for proof and allowance of the same before he can succeed in the action.

2. **Notice: EVIDENCE.** Under the facts in this case, *held*, that the appellee has not proved the allegations of his petition that the creditor had notice or knowledge of the bankruptcy proceedings.

APPEAL for the district court from Box Butte county: JAMES J. HARRINGTON, JUDGE. *Reversed and dismissed.*

*H. M. Sinclair, W. P. Hall* and *R. C. Noleman,* for appellants.

*J. L. McPheely* and *William Mitchell, contra.*

LETTON, C.

On the 6th day of December, 1898, W. P. Hall recovered a judgment in the county court of Phelps county against H. C. Armstrong and Swen Morrine, for the sum of $462.10, with interest and costs. On the 8th day of April, 1899, H. C. Armstrong, being then a resident of Alliance, Box Butte county, Nebraska, filed his petition in the United States court for the district of Nebraska, praying that he be adjudged a bankrupt under the bankruptcy act. On April 10, 1899, he was adjudged a bankrupt, and on August 3, 1899, he was discharged as a bankrupt. The notes upon which the judgment was rendered in favor of Hall were made to Swen Morrine, as payee, and had been indorsed and delivered to Hall by him before the recovery of the judgment. In the bankruptcy proceedings a claim was scheduled in this manner: "31. Swan

Morrise. Addressed, Bertrand, Neb. Judgment for the sum of $325. The consideration for the above debt was money loaned to petitioner at Bertrand, Neb., in 1895." The name of Swen Morrine did not appear in the schedule, and no claim was listed in favor of W. P. Hall. On the 12th day of July, 1900, Hall filed a transcript of the judgment in the office of the clerk of the district court for Box Butte county, and caused an execution to be issued on the same and placed in the hands of the defendant Sweeney, as sheriff of that county, for service. By virtue of this execution, Sweeney, as sheriff, levied on certain personal property belonging to Armstrong, and was about to advertise and sell the same on execution when Armstrong began this action in the district court for Box Butte county to enjoin W. P. Hall and E. P. Sweeney, as sheriff, from proceeding to collect the judgment by execution. The petition sets forth the bankruptcy proceedings, the discharge of Armstrong, and pleads that Hall had notice and actual knowledge of the bankruptcy proceedings in ample time to have had the judgment property scheduled among the liabilities of the bankrupt, and to have made due proof of his claim against the bankrupt. Hall answered, admitting the judgment and levy, and denying all the other allegations of the petition.

There is only one question in this case, and that is, did Hall have knowledge of the bankruptcy proceedings in time to schedule his claim for proof and allowance. Armstrong testifies that on the 10th day of June, 1899, he was in Omaha for the purpose of listing one of his creditors, named Palm, whose name he had omitted from the list by inadvertence; that he met Mr. Hall upon the street near the Paxton Hotel. He was then asked: "What conversation did you have with Mr. Hall at that time in regard to your bankruptcy proceedings?" "He said: 'I see you are going through bankruptcy.' He laughed, and there was a lot of joshing going on." Mr Hall testifies that he met Mr. Armstrong somewhere near the Paxton

Hotel sometime during the summer of 1899; his best impression was that it was after the month of June, and further testifies:

Q. At that time was there anything said by you to him or he to you about taking bankruptcy proceedings?

. A. No, sir.

Q. At that time did either of you say anything about his taking the bankruptcy act?

A. No, sir.

Q. During that summer was there anything said about him taking the bankruptcy act?

A. No, sir.

Mr. Hall further testifies that he had no notice or knowledge of the bankruptcy proceedings until the fall or winter of 1899. Swen Morrine testifies that during the months of March, April and May, 1899, he lived in Kearney; that he never received any notice by mail or otherwise of the bankruptcy proceedings, and did not take a notice to Mr. Hall's office; and that he did not hear of Armstrong's filing a petition in bankruptcy until a long time afterwards. C. H. Roberts, an attorney at law, who formerly resided at Holdrege, but now resides in Boise, Idaho, testified that he was acquainted with W. P. Hall and Swen Morrine; that he had knowledge of Armstrong's instituting bankruptcy proceedings, which knowledge he obtained from W. P. Hall; that he had no actual knowledge that Swen Morrine ever had any notice of the proceedings, and never had any conversation with him regarding the same. He states further that he had a conversation with Mr. Hall about the bankruptcy proceedings; that he advised with him upon this matter shortly before he left Holdrege; that the communications were of a privileged character, and that he did not care to disclose the nature of them. He further says, however, that he cannot tell the exact date of this conversation, but it was a short time before he left Holdrege, which was in October, 1900. Sam A. Dravo, of Holdrege, testified that he knew the parties; that the first he knew of Armstrong's

taking bankruptcy proceedings was from Mr. Hall. He
says: "He told me that Armstrong had taken or was tak-
ing, I don't know which, and for me not to say anything
about it to Armstrong as he owned the Swen Morrine
judgment or claim, I don't know which, and was either
going to sue him or issue execution. I think he said
he was going to issue execution; that he knew where he
was running a saloon and that he would jump onto the
fixtures. As to these conversations Mr. Hall testifies that
he had the conversation with Mr. Roberts in the latter
part of the summer or early in the fall of 1900, and that
he had the conversation with Mr. Dravo just before he
filed the transcript and had the execution issued, which
was in June, 1900. This is all the testimony relating to
the knowledge of Mr. Hall of the bankruptcy proceedings.
The burden of proof was upon the plaintiff, Armstrong,
to sustain the allegation of his petition that Hall had
knowledge of the bankruptcy proceedings in time to file
his claim. Armstrong states that Hall said to him in
June, 1899: "I see you are going through bankruptcy."
This is positively denied by Hall, who further swears he
had no knowledge of the proceedings until after Arm-
strong's discharge. The conversations had between Hall
and Roberts, and Hall and Dravo, were had a long time
after the bankruptcy proceedings were over. Roberts fixes
the time of his conversation as being after this period.
Dravo is uncertain.as to time, but his statement that in that
conversation Hall stated to him that Armstrong was run-
ning a saloon, and he was about to jump onto the fixtures,
corroborates Hall's testimony that this conversation took
place just before he had the transcript filed and execution
issued. It seems hardly probable that Mr. Hall, an ex-
perienced lawyer, knowing that he had a judgment of
nearly $500 against Armstrong, if he knew that Armstrong
was going through bankruptcy, would have taken no steps
to protect his judgment. Taking the testimony as a whole,
we are of the opinion that Armstrong had not sustained
the allegation of his petition that Hall had notice of the

proceedings. Under the bankruptcy act, which provides that the bankrupt is discharged from all his provable debts, except such as have not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, unless such creditor had notice of the proceedings in bankruptcy, Armstrong was not discharged from the judgment debt and Hall had the right to have the execution issued and levied upon the goods in controversy.

We are of the opinion that the judgment of the district court should be reversed, and judgment entered in this court in favor of the appellants dissolving the injunction and dismissing the case.

AMES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed, and judgment is entered in this court in favor of the appellants dissolving the injunction and dismissing the case.

JUDGMENT ACCORDINGLY.